PAUL A. BRESLIN & others[1] *vs.* SCHOOL COMMITTEE
OF QUINCY
(and a companion case[2]).

Norfolk.  January 10, 1985. — May 17, 1985.

Present: GREANEY, C.J., KASS, & FINE, JJ.

*School and School Committee,* Dismissal of tenured personnel, Transfer of
    administrator. *Due Process of Law*, Termination of employment.

In an action under G. L. c. 71, § 43A, seeking review of a school committee's
    decision to abolish the plaintiffs' junior high school administrative po-
    sitions during a reorganization plan which established middle schools
    in the place of junior high schools, and to utilize an open selection
    process for filling the new middle school administrative positions, result-
    ing in reduction in rank for the plaintiffs, evidence warranted the judge's
    findings that the planning and execution of the reorganization, and hence
    the elimination of the plaintiffs' jobs, were based on educational policy
    and undertaken in good faith, and that, accordingly, demotion hearings
    under c. 71, § 42A, were not required. [79-81]
A junior high school principal who was demoted to an assistant principal
    in one of the middle schools which were established in the place of
    junior high schools during a reorganization plan found not to be tainted
    with unfairness or improper motive had no constitutional right to a
    hearing under the rationale of *Cleveland Bd. of Educ.* v. *Loudermill,*
    470 U.S. 532 (1985), prior to his reduction in rank. [81-82]

CIVIL ACTIONS commenced in the Superior Court Department
on June 25, 1982, and August 27, 1982, respectively.
    The cases were heard by *George Jacobs,* J.
    *Americo A. Salini, Jr.,* for Arnold A. Rubin & others.
    *Arthur H. Goldsmith* for Paul A. Breslin.

---

[1] Arnold A. Rubin, Charles V. Hickey and John Scanlan, Jr. Three other
plaintiffs withdrew from the action, one by reason of retirement and two
because they were appointed to principalships.

[2] Paul A. Breslin & others *vs.* School Committee of Quincy.

*Arthur Murphy* (*J. Michael Conley* with him) for School Committee of Quincy.

KASS, J. On February 24, 1982, the school committee of Quincy adopted a reorganization plan which abolished five junior high schools and established middle schools in the buildings which had housed the junior highs. By the time the dust of reorganization settled, the plaintiff Breslin, who had been a junior high school principal, was reduced to an assistant principal in one of the middle schools, and the plaintiffs Hickey, Rubin and Scanlan had been returned to the ranks of teachers.

The plaintiffs, acting under G. L. c. 71, § 43A, as amended by St. 1977, c. 671, and under G. L. c. 231A, complain that they did not receive the demotion hearings to which they were entitled under G. L. c. 71, § 42A, and that they were, therefore, unlawfully reduced in the school hierarchy. Breslin, in a separate brief, also argues unconstitutional deprivation of property rights.[3] A judge of the Superior Court, after hearing, found the planning and execution of the reorganization, and hence the elimination of the plaintiffs' jobs, to have been based on educational policy and undertaken in good faith. Accordingly, he concluded, no hearing under G. L. c. 71, § 42A, or under the State or United States Constitutions, was required. Judgment entered declaring that the committee had acted in accordance with law; that the plaintiffs' salaries had been lawfully reduced; and that the counts in the complaints demanding a de novo hearing in the Superior Court were dismissed. We affirm.

1. *Statutory right to a hearing.* By the time of the appeal, the plaintiffs no longer challenged the legitimacy of the underlying school reorganization plan. That plan included: the closing of four elementary schools and the five junior high schools; and the establishment of the middle schools and a change in grade lines so that elementary schools would have kindergarten

---

[3] The plaintiffs instituted two actions. One was filed on June 25, 1982, and challenged the committee's vote of May 26, 1982, to open the administrative positions to all applicants. The second, filed August 27, 1982, challenged the vote to demote the junior high administrators. The cases were consolidated for trial, and a single judgment was entered. The cases were also consolidated on appeal.

through fifth grade, the middle schools would have sixth, seventh, and eighth grades, and the high school would have grades nine through twelve. The former junior high school principals and assistant principals were not, however, automatically assigned to counterpart positions in the middle schools. Rather, the committee saw the principalships and assistant principalships of the middle schools as functionally different and declared those positions open to all qualified comers within the Quincy school system, including the plaintiffs. That aspect of the reorganization, the plaintiffs assert, was a sham, with no better purpose than to ease them out of their posts.

Much of the case, therefore, turns on the good faith of the committee's differentiation between the junior high and the middle school jobs. As to that question the trial judge made careful and detailed findings, which we accept in the absence of clear error. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *Powers* v. *Freetown-Lakeville Reg. Sch. Dist. Comm.*, 392 Mass. 656, 659 (1984). *Neponset Reservoir Corp.* v. *Bashaw*, 8 Mass. App. Ct. 35, 36 (1979), and cases cited. We summarize those findings, including those which deal with the underlying structural reorganization. The process was a continuing one and the structural decisions color whether the determination to treat the middle school jobs as distinct was fair or a pretext.

Since 1976, the idea of middle schools had been the subject of study by the Quincy public school department. Lawrence Creedon, the superintendent of schools, had recommended a school system reorganization in 1978 and had publicly supported the middle school concept for some time before it was adopted by the school committee for implementation in September of 1982. In 1981, the Quincy school committee appointed a "Citizens Task Force," chaired by the superintendent, to study reorganization alternatives. On January 27, 1981, a large majority of the task force voted in favor of the middle school concept. On February 24, 1982, the school committee considered several reorganization plans and adopted, with some modifications, a plan which included middle schools. The reorganization was undertaken by the committee in good faith and

without caprice.[4] On or about February 24, 1982, an assistant superintendent of schools informed the school committee that the central school administration was going to recommend that the principals and assistant principals of the junior high schools not automatically hold counterpart positions in the middle schools. On April 7, 1982, Superintendent Creedon did so recommend, on the ground that the middle school was a species of educational institution different from a junior high school.

Consistent with that recommendation, and after a hearing on April 7, 1982, which the junior high school principals had requested, the school committee on May 26, 1982, declared that the positions of principal and assistant principal and assistant principal in the new middle schools were open and that applications to fill those positions would be accepted from all certified and qualified persons within the Quincy public school system. On May 28, 1982, an assistant superintendent of the Quincy school department met with the president of the Quincy Education Association (QEA), the collective bargaining representative for professional employees of the school system, to receive suggestions about filling the new positions.

Thereafter the school committee established a screening committee to interview and recommend candidates. The screening committee was chaired by an assistant superintendent and was comprised of a QEA representative and a PTA representative, in addition to several members of the school administration. Superintendent Creedon's brother was an elementary school principal whose school was to be closed as part of the reorganization. He applied for one of the middle school positions. To avoid any potential conflict of interest regarding his brother's appointment, the superintendent had not been placed on the screening committee.

---

[4] A majority of the committee, the judge found, were influenced by consideration of a decline in student enrollment of some 40% since 1971, a budget reduction of approximately 25% over the period of time between enactment of Proposition 2½ (G. L. c. 59, § 20A) and adoption of the reorganization plan, as well as the perception that the middle school concept was the best way to deal with both the changes wrought by these declining enrollments and resources and the developing educational needs of the Quincy schools.

All of the plaintiffs were eligible to apply for the position of middle school principal or assistant principal, and at least some availed themselves of that opportunity. None received the recommendation of the screening committee for a position as principal. One received a recommendation for a middle school assistant principalship and was appointed. The appointments of the middle school principals and assistant principals were made on July 15, 1982, and August 11, 1982, respectively.

A hearing before the school committee about the matter of the proposed "demotion" of the plaintiffs from their junior high school positions was scheduled for July 7, 1982. By consent of the parties, it was postponed to August 11. Each plaintiff was given timely notice of the intended vote of the August 11, 1982, meeting and was furnished by the committee with a writing setting forth the cause of the proposed "demotion." Counsel for the plaintiffs were present and were given the opportunity to examine and cross-examine witnesses. Those protections were provided even though, as the notice indicated, the school committee did not view the hearing provisions of G. L. c. 71 as applicable. There was no evidence introduced at the August 11, 1982, hearing, or at the trial, of any wrongdoing or significant failing on the part of any of the plaintiffs. Upon the superintendent's recommendation, the committee voted to relieve the plaintiffs of their administrative jobs on the basis that their junior high school positions had been eliminated in the reorganization.

Running a middle school, the judge found, required substantially different managerial and leadership capacity. Notably: (a) the educational approach of the middle schools was student-centered while that of the junior highs was subject-centered; (b) disciplinary problems loomed less large because there was no ninth grade in the middle schools, i.e., student misconduct was likely to be of a more benign, pre-adolescent sort; (c) there would be greater emphasis on basic elementary school skills; (d) the sixth grade teachers who would be on the middle school faculties would need different supervision and support; (e) the athletic focus in the middle schools would be exclusively

on intramural sports which attracted broad participation, rather than on interscholastic competition; (f) social programs at the middle schools would be less sophisticated — no evening proms; (g) the team teaching approach would be different and more extensive; (h) the teacher would act as a counsellor more in the middle school than in the junior high; and (i) more parent involvement, more teaching, and more teacher training would be required of middle school administrators.

These distinctions, the plaintiffs argue, are excessively subtle and mask the fundamental similarity of the middle school and junior high school models. Above all, the plaintiffs claim experience with such programmatic distinctions as might be found between the middle school and junior high models; they insist that the evidence points inescapably to the conclusion that the screening committee and the school committee engaged in an elaborate charade to do the plaintiffs out of their jobs. The judge's findings concerning the good faith and genuine nature of the selection process, the plaintiffs say, are, therefore, clearly erroneous.

On our review of the record, there is ample evidence to support the judge's findings. That evidence consists largely of the testimony of the school superintendent and two middle school principals. The trial judge was entitled to give more credence to the testimony favoring the school committee than to that favoring the plaintiffs. He may also fairly have concluded that much of the plaintiffs' evidence was misdirected. It emphasized the competence of the plaintiffs for the new jobs. That was not in issue. The issue was whether the positions of middle school principal and assistant principal, across the board, required different skills from those previously required of junior high school administrators.

Deference, of course, was due the determination of the school committee, and the trial judge's scope of review, like ours, was limited. *Kaplan* v. *School Comm. of Melrose*, 363 Mass. 332, 335 (1973). *Springgate* v. *School Comm. of Mattapoisett*, 11 Mass. App. Ct. 304, 306 (1981). *Kurlander* v. *School Comm. of Williamstown*, 16 Mass. App. Ct. 350, 359

(1983).[5] The judicial task is to make sure that a dismissal or demotion is not based on a ground which is arbitrary or irrelevant to the task of running a school system.

Once it is established that the abolition of the junior high administrative positions was rooted in policy and that there were reasons related to educational objectives in opting for an open selection process for the new jobs, the case for the plaintiffs collapses. Although G. L. c. 71, § 42A, provides protection to school administrators against demotion, that protection does not extend to tenured positions eliminated by good faith administrative decisions. *Kaplan* v. *School Comm. of Melrose*, 363 Mass. at 336. *Jantzen* v. *School Comm. of Chelmsford*, 332 Mass. 175, 178 (1955) ("In the last analysis it would have come down to the question whether the closing of her school, which was the cause of her losing her position, was a reality and not a pretence or sham"). The design of § 42A is to induce fairness in demotions for cause related to job performance, not to make organizational restructure an occasion for a separate hearing as to each person affected. *Lane* v. *School Comm. of Paxton*, 378 Mass. 794 (1979). *Boston Teachers Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 215-216 (1982). *Nutter* v. *School Comm. of Lowell*, 5 Mass. App. Ct. 77, 80 (1977). Contrast *Powers* v. *Freetown-Lakeville Reg. Sch. Dist. Comm.*, 392 Mass. at 661, which dealt with an "individual situation, not a systemic reorganization." Cf. *Black* v. *School Comm. of Malden*, 365 Mass. 197, 205 (1974). Once the plaintiffs' junior high school positions were abolished, the statute afforded them no right to be appointed to functionally different middle school positions. *Jantzen* v. *School Comm. of Chelmsford*, 332 Mass. at 177-178. *Kaplan* v. *School Comm. of Melrose*, 363 Mass. at 336. Indeed, the school committee,

---

[5] We ascribe no weight to the argument that the creation of the middle school openings was a device to make a job for the superintendent's brother, who, upon recommendation of the screening committee, was appointed an assistant principal of a middle school. The superintendent was not a member of the screening committee. The trial judge found no evidence that the superintendent's planning and proposals had been influenced by his brother's situation.

acting in the public interest, was duty bound to employ the best qualified candidates for the middle school posts. *Jantzen, supra* at 177-178.

2. *Constitutional protection.* The plaintiff Breslin filed a motion for post judgment relief under Mass.R.Civ.P. 60, 365 Mass. 828 (1974) (the motion does not state under what sub-paragraph it is brought, but subparagraph [6] is the only pos-sibility). The motion raises only afterthoughts and we would not consider them but for *Cleveland Bd. of Educ.* v. *Loudermill,* 470 U.S. 532 (1985), an opinion of the United States Supreme Court which was issued after the instant case was briefed and argued. *Loudermill* involved the dismissal of two public em-ployees under an Ohio civil service statute that entitled them to retain their positions absent " 'misfeasance, malfeasance or nonfeasance in office.' " *Id.* at 538-539. That statute, the court ruled, supported the conclusion that the respondents had a property right in continued employment. Because the employ-ees faced the severe sanction of losing their livelihood, the court concluded that due process required a hearing before termination. *Id.* at 542-543.

Due process, however, is "a protean concept which imports different procedures in different situations." *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, 24 (1975). To the extent that Breslin had a protectable interest in keeping his principalship, he was entitled under the due process clause to an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976). Had Breslin been threatened with dismissal because of his performance he would, in fact, have been entitled to the hearing procedure prescribed by § 42A. In the context of a bona fide reorganization, however, the school committee had plenary power to abolish his position and to assign him to a lesser one. Individual hearings for Breslin and others similarly situated would have been meaningless and burden-some to the committee. Compare *Milne* v. *School Comm. of Manchester,* 381 Mass. 581, 583 (1980), with *Glennon* v. *School Comm. of Boston,* 375 Mass. 757, 767 (1978). Adoption of the policies which led to elimination of Breslin's old

job had already been the subject of hearings. Indeed, Breslin had appeared before the committee to advocate his view that the middle school jobs were not much different from the junior high jobs and that his experience would be valuable. We do not read *Loudermill* as reaching the case of an employee displaced by a reorganization found not to be tainted with unfairness or improper motive.

*Judgments affirmed.*